Eric T. Kanefsky
Ralph J. Marra, Jr.
Thomas R. Calcagni
Martin B. Gandelman
CALCAGNI & KANEFSKY LLP
1085 Raymond Blvd., 14th Floor
Newark, New Jersey 07102
Telephone: (862) 397-1796
eric@ck-litigation.com
rmarra@ck-litigation.com
tcalcagni@ck-litigation.com
mgandelman@ck-litigation.com

Daniel L. Brockett (*pro hac vice* forthcoming)
Manisha M. Sheth (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010-1601
Telephone: (212) 849-7000
danbrockett@quinnemanuel.com
manishasheth@quinnemanuel.com

Michael Eisenkraft
Laura Posner (*pro hac vice* forthcoming)
Christopher Bateman (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-0177
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com
cbateman@cohenmilstein.com

Daniel H. Silverman (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street, Suite 207
Boston, MA 02130
Tel: (617) 858-1990
dsilverman@cohenmilstein.com

*Attorneys for Plaintiff and the Proposed Class*

[Additional Counsel on the Signature Page]

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| CRIMSON CANDLE SUPPLIES LLC, on behalf of itself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>DSM-FIRMENICH AG, FIRMENICH INTERNATIONAL SA, FIRMENICH INC., AGILEX FLAVORS & FRAGRANCES, INC., GIVAUDAN SA, GIVAUDAN FRAGRANCES CORP., GIVAUDAN FLAVORS CORP., UNGERER & COMPANY, INC., CUSTOM ESSENCE INC., INTERNATIONAL FLAVORS & FRAGRANCES INC., SYMRISE AG, SYMRISE INC., AND SYMRISE US LLC<br><br>*Defendants*. | CIVIL ACTION NO.: 2:23-cv-3875<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ................................................................................1

II.    JURISDICTION AND VENUE ...........................................................................5

III.   PARTIES .............................................................................................................6

       A.     Plaintiff ...................................................................................................6

       B.     Defendants ..............................................................................................7

IV.    AGENTS AND CO-CONSPIRATORS .............................................................11

V.     TRADE AND COMMERCE.............................................................................11

VI.    FACTUAL ALLEGATIONS ............................................................................12

       A.     Factual Background ..............................................................................12

       B.     Conspiracy to Allocate Customers and Products, and to Inflate
              Fragrance Prices...................................................................................15

              1.     Antitrust Enforcement Authorities in Europe and the
                     United States Are Investigating Defendants for Conspiring
                     to Increase the Prices of Fragrances by Allocating
                     Customers and Restricting Supply..............................................15

              2.     Defendants' Increased Ability to Reverse-Engineer Their
                     Competitors' Fragrances Incentivized and Provided a
                     Motive for the Conspiracy ..........................................................17

              3.     Defendants Conspired to Allocate Their Customers and
                     Inflate the Prices of Fragrances and Fragrance Ingredients......20

              4.     Defendants' Conspiracy Resulted in Price Increases..................24

              5.     Plus Factors Render the Fragrance and Fragrance
                     Ingredients Market Susceptible to Precisely the
                     Conspiratorial Conduct Alleged Here.........................................27

       C.     Anticompetitive Effects and Injury Suffered by Class Members .........38

VII.   STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS....................39

       A.     Continuing Violation ............................................................................39

       B.     Fraudulent Concealment .......................................................................39

VIII.  CLASS ACTION ALLEGATIONS ...................................................................41

IX.     CAUSE OF ACTION ........................................................................................44

X.      PRAYER FOR RELIEF ....................................................................................46

XI.     JURY TRIAL DEMAND ..................................................................................47

Plaintiff Crimson Candle Supplies LLC ("Plaintiff") brings this action on behalf of itself and all others similarly situated (the "Class"), consisting of all persons and entities that purchased fragrances or fragrance ingredients directly from Defendants or their subsidiaries or affiliates in the United States, its territories, and the District of Columbia, including those who purchased fragrances or fragrance ingredients outside the United States but were billed or invoiced for fragrances or fragrance ingredients that were imported into the United States, from January 1, 2012 until the effect of the conspiracy ceased (the "Class Period"). Plaintiff brings this action for damages, injunctive relief, and other relief pursuant to the federal antitrust law and demands a trial by jury on all matters.

## I.      NATURE OF THE ACTION

1.      Plaintiff brings this civil antitrust action seeking treble damages arising out of Defendants' conspiracy to allocate, and unreasonably restrain trade in, the market for fragrances and fragrance ingredients manufactured by Defendants from January 1, 2012 to the present.

2.      Every day, most Americans use innumerable consumer products that contain fragrances. Fragrances are a necessary component of all consumer products that contain scents, including cosmetics, soaps, shampoos, deodorants, perfumes, laundry detergents, fabric softeners, room fresheners, and personal care products. Those fragrances (also known as fragrance compounds) are made up of oils derived from natural products and synthetically created chemicals often derived from petrochemicals (collectively, "fragrance ingredients"), among other products like alcohols and coal.

3.      Defendants named in this Complaint are the four largest global manufacturers of flavors and fragrances, operating in an approximately $26.5 billion worldwide market. The fragrances market in the United States alone is valued at approximately $8.7 billion. Defendants collectively hold approximately 64% of the global flavors and fragrances market, and between 66-

70% of the global fragrances market. They hold substantially similar shares of the respective United States' markets.

4.     The claims in this case arise from a broad conspiracy among Defendants related to their activity manufacturing fragrances and fragrance ingredients and selling fragrances to consumer product producers. As detailed herein, in order to restrain trade and inflate prices in the fragrances market, Defendants agreed to allocate that market by collectively deciding to each produce only a fragment of the total fragrance ingredients that are used to make fragrances—leaving them each unable to compete for fragrance requests from customers that required the fragrance ingredients they did not produce.

5.     In recent years, Defendants have faced a threat to their historic market dominance and high profits: competitors' abilities to cheaply and efficiently reverse-engineer and replicate Defendants' fragrances. Using increasingly effective technologies, Defendants (and their customers) now have the capability to determine with remarkable accuracy the fragrance ingredients included in a fragrance. So, Defendants cannot be sure that the fragrances they sell to customers to include in a wide-variety of consumer products will remain proprietary; all it takes to decode the fragrance is running a chemical test on the product that shows the fragrance ingredients therein and the volume in which they are used.

6.     Defendants rely on approximately 3,000 of these naturally occurring and synthetic fragrance ingredients to make fragrances for their customers. Different customers (and different fragrances for the same customers) rely on different subsets of those fragrance ingredients—which replicate different scents—for their products.

7.     Except for unique molecules that Defendants have invented ("captives"), Defendants cannot rely on patents to protect their fragrance ingredients nor their fragrances,

because one cannot patent a smell. That is because a product is patentable only if it is "useful," not if it is a form of creative expression. But smells (and therefore fragrances) offer aesthetic value by making consumer products more appealing; they do not meet the standard of utility required for patent production under United States law. For the same reason, Defendants' captive molecules *are* patentable. Instead of providing aesthetic value, Defendants that produce a novel molecule for *use* in scents have created a *usable*—and therefore patentable—product.

8.      The ability to determine the precise fragrance ingredient make-up of a given fragrance poses a major threat to Defendants, whose artificially inflated profits depend on their ability to serve as the only provider for each of their respective fragrances to their customers. Those customers include some of the largest consumer products producers in the world, like Procter & Gamble, Unilever, and LVMH.

9.      Rather than combat this threat through competitive means, however, Defendants, beginning at least as early as 2012, entered into an unlawful agreement to fix, raise, stabilize, and maintain the prices of fragrances and fragrance ingredients, in part by allocating customers among themselves and allocating specific fragrance ingredients that each of them would produce (and that the others would not produce).

10.     To limit competition in the fragrance manufacturing market, that is, each Defendant agreed to produce only *some* of the synthetic and natural fragrance ingredients used to make fragrances. This agreement was not based on manufacturing or sourcing limitations; each Defendant is a large, multinational manufacturer with the capability to make or procure substantially all of the synthetic and natural chemicals used to manufacture fragrances. And this allocation excludes "captive" chemicals that Defendants invented and are able to patent. Thus,

Defendants agreed to produce only a specific segment of fragrance ingredients used to make fragrances in order to restrain competition in the fragrances market.

11. Because Defendants produce only some fragrance ingredients, they effectively allocate customers because they cannot compete for specific contracts that require fragrance ingredients that they do not produce. In other words, if a customer puts out a request for a fragrance requiring a specific ingredient, only some (or one) of Defendants will be able to produce it and, therefore, only some (or one) of Defendants will compete for that contract. This works to artificially inflate the price of fragrances because customers are left with fewer (or only one) options to produce their fragrance. As a result, there is no meaningful price competition for those fragrances, allowing Defendants to increase their prices above competitive levels. Defendants did just that.

12. The conspiracy was effectuated by direct company-to-company contacts among the manufacturers, as well as joint activities undertaken through trade associations such as the International Fragrance Association ("IFRA").

13. The fragrance manufacturing industry is susceptible to precisely this type of collusion. Defendants control a huge portion of the fragrance market in the United States (more than 65%) and the industry is highly consolidated. There are high barriers to entry, preventing new entrants from joining the fragrance manufacturing market to steal market share from Defendants by undercutting them with competitive pricing. The demand for fragrances is inelastic—meaning customers are unlikely to switch to substitute products (which do not exist) in the event of a price increase caused by market forces, let alone a collusive price increase. And Defendants have remarkably cozy relationships. They have formed a trade association together, which for a time included no other members and has only ever added one additional member. They have attended

industry events together, providing a forum to share competitively sensitive information. These facts illustrate the plausibility that Defendants engaged in the anticompetitive acts described herein.

14.    Defendants' conspiracy to inflate the price of fragrances by allocating products and customers harmed Plaintiff and members of the Class. Plaintiff and the Class are the direct purchasers of fragrances and fragrance ingredients from Defendants. As explained, Defendants are the dominant firms in the fragrance manufacturing markets and Class members purchased billions of dollars' worth of fragrances from them. Little did they know, however, that those fragrances were worth less than Plaintiffs paid for them, and their prices were inflated because Defendants had agreed not to compete. Plaintiffs are entitled to damages and all other remedies permitted by law.

## II.    JURISDICTION AND VENUE

15.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26.

16.    This Court has personal jurisdiction over each of the Defendants pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, Federal Rule of Civil Procedure 4(h)(1)(A), and the long-arm statute of New Jersey. Defendants Symrise Inc., Firmenich Inc., and Agilex Flavors & Fragrances, Inc. all reside in this District and used their headquarters in Teterboro, Plainsboro, and Piscataway, New Jersey, respectively, to implement and coordinate the restraints of trade described herein. In addition, Defendants: (1) transacted substantial business in the United States, including in this District; (2) transacted with, and caused injury to, Class Members located throughout the United States, including in this District; and (3) committed substantial acts in furtherance of the unlawful scheme in the United States, including in this District. For example:

- Each of the Defendants regularly sold products in the state of New Jersey during the Class Period and continues to sell products in the state of New Jersey;

- In addition to the companies mentioned above that are headquartered in New Jersey, Givaudan Fragrances Corp. runs its operations mainly out of New Jersey and IFF has its principal research and development operations partially in New Jersey;

- Both during the Class Period and through the present, all Defendants or their subsidiaries maintain substantial operations in this District; and

- Both during the Class Period and through the present, all Defendants transacted substantial business in this district, including making significant sales within the District.

17.    Venue is proper in this District under 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because one or more of the Defendants transacted business, was found, and/or resided in this District; a substantial part of the events giving rise to Plaintiffs' claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

18.    Defendants' fragrances and fragrance ingredients at issue in this case are sold in interstate commerce, and the unlawful activities alleged in this Complaint have occurred in, and have had a substantial effect upon, interstate commerce in the United States.

### III.    PARTIES

A.    **Plaintiff**

19.    Plaintiff Crimson Candle Supplies LLC is a Texas limited liability company that manufactures and sells a variety of candle making supplies including fragrance oils, silicone molds, and dyes. Crimson Candle Supplies is headquartered at 401 Enterprise Street, Longview,

Texas 75604. During the Class Period, Plaintiff purchased fragrances and fragrance ingredients directly from one or more of the Defendants and has suffered monetary loss as a result of the antitrust violations alleged herein.

**B.    Defendants**

20.    Defendant DSM-Firmenich AG is a Swiss corporation that recently formed out of a merger between Firmenich International S.A. and DSM Group. DSM-Firmenich AG manufactures and sells fragrances and fragrance ingredients. DSM-Firmenich AG has headquarters in Kaiseraugst, Switzerland and Maastricht, Netherlands and is a publicly traded company. Directly or through its wholly-owned and controlled subsidiaries, DSM-Firmenich AG has significant operations throughout the United States and manufactured and/or sold fragrances and fragrance ingredients to purchasers in the United States and elsewhere, directly or through predecessors, affiliates, or subsidiaries.

21.    Defendant Firmenich International SA is a Swiss corporation that sells fragrances and fragrance ingredients. Firmenich International SA is headquartered in Satigny, Switzerland. Prior to its merger with DSM Group, Firmenich International SA operated throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Firmenich International SA manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries.

22.    Defendant Firmenich Inc. is a United States subsidiary of DSM-Firmenich AG, incorporated in Delaware with its principal place of business and headquarters in Plainsboro, New Jersey. During the Class Period, Firmenich Inc. manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries. During the Class Period, DSM-Firmenich AG and Firmenich International S.A.

controlled, dictated, and encouraged Firmenich Inc.'s actions, both generally and with respect to Firmenich Inc.'s conduct and unlawful acts as alleged herein.

23.     Defendant Agilex Flavors & Fragrances, Inc. is a United States subsidiary of DSM-Firmenich AG, incorporated in Delaware with its principal place of business and headquarters in Piscataway, New Jersey. During the Class Period, Agilex manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries. During the Class Period, DSM-Firmenich AG and Firmenich International S.A. controlled, dictated, and encouraged Agilex's actions, both generally and with respect to Firmenich Inc.'s conduct and unlawful acts as alleged herein.

24.     DSM-Firmenich AG, Firmenich International SA, Firmenich Inc., and Agilex Flavors & Fragrances, Inc. are collectively referred to throughout the Complaint as Firmenich.

25.     Defendant Givaudan SA is a Swiss corporation that sells fragrances and fragrance ingredients. Givaudan SA is headquartered in Vernier, Switzerland and is a publicly traded company. During the Class Period, Givaudan SA operated throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period, Givaudan SA manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries.

26.     Defendant Givaudan Fragrances Corporation is a United States subsidiary of Givaudan SA incorporated in Delaware with its listed headquarters in Cincinnati, Ohio but its principal operations in East Hanover, New Jersey. During the Class Period, Givaudan Fragrances Corp. manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries. During the Class Period, Givaudan SA controlled, dictated, and encouraged Givaudan Fragrances Corp.'s actions, both

generally and with respect to Givaudan Fragrances Corporation's conduct and unlawful acts as alleged herein.

27.     Defendant Givaudan Flavors Corporation is a United States subsidiary of Givaudan SA incorporated in Delaware with its headquarters in Cincinnati, Ohio and its principal place of business in East Hanover, New Jersey. During the Class Period, Givaudan Flavors Corp. manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries. During the Class Period, Givaudan SA controlled, dictated, and encouraged Givaudan Flavor Corp.'s actions, both generally and with respect to Givaudan Flavor Corp.'s conduct and unlawful acts as alleged herein.

28.     Defendant Ungerer & Company, Inc. is a United States subsidiary of Givaudan SA incorporated in Delaware with its principal place of business in Lincoln Park, New Jersey that conducts manufacturing operations in Bethlehem, Pennsylvania. Since 2020 when Givaudan SA acquired Ungerer & Company, Inc., Givaudan SA has controlled, dictated, and encouraged Ungerer & Company Inc.'s actions, both generally and with respect to Ungerer & Company Inc.'s conduct and unlawful acts as alleged herein. During the Class Period, Ungerer & Company Inc. manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries.

29.     Defendant Custom Essence Inc. is a United States subsidiary of Givaudan SA incorporated in New Jersey with its principal place of business in Somerset, New Jersey. During the Class Period, Custom Essence manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries. Since 2021 when Givaudan SA acquired Custom Essence, Givaudan SA has controlled, dictated,

and encouraged Custom Essence's actions, both generally and with respect to Custom Essence's conduct and unlawful acts as alleged herein.

30.     Givaudan SA, Givaudan Fragrances Corporation, Givaudan Flavors Corporation, Ungerer & Company, Inc., and Custom Essence Inc. are collectively referred to throughout the Complaint as Givaudan.

31.     Defendant International Flavors & Fragrances, Inc. ("IFF") is a New York corporation that sells fragrances and fragrance ingredients. IFF is headquartered in New York, New York and is a publicly traded company. During the Class Period, IFF manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries.

32.     Defendant Symrise AG is a German corporation that sells fragrances and fragrance ingredients. Symrise AG is headquartered in Holzminden, Germany. During the Class Period, Symrise AG operated throughout the United States, either directly or through its wholly-owned and controlled subsidiaries and affiliates. During the Class Period Symrise AG manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries.

33.     Defendant Symrise Inc. is a U.S. subsidiary of Symrise AG incorporated in New Jersey with its headquarters and principal operations in Teterboro, New Jersey. During the Class Period, Symrise Inc. manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries. During the Class Period, Symrise AG controlled, dictated, and encouraged Symrise Inc.'s actions, both generally and with respect to Symrise Inc.'s conduct and unlawful acts as alleged herein.

34.     Defendant Symrise US LLC is a United States subsidiary of Symrise AG incorporated in Delaware with its headquarters and principal place of business in Teterboro, New Jersey. During the Class Period, Symrise US LLC manufactured and sold fragrances and fragrance ingredients to purchasers in the United States, directly and through predecessors, affiliates, and subsidiaries. During the Class Period, Symrise AG controlled, dictated, and encouraged Symrise US LLC's actions, both generally and with respect to Symrise US LLC's conduct and unlawful acts as alleged herein.

35.     Symrise AG, Symrise Inc., and Symrise US LLC are collectively referred to throughout the Complaint as Symrise.

## IV.     AGENTS AND CO-CONSPIRATORS

36.     Additional persons and entities not named as Defendants in this Complaint have participated as co-conspirators with Defendants and have performed acts and made statements in furtherance of the conspiracy to fix and increase the price of fragrances and fragrance ingredients by, *inter alia*, allocating fragrances and fragrance ingredients among each other and/or allocating customers among each other, as alleged herein.

37.     Defendants are jointly and severally liable for the acts of the co-conspirators whether or not named as defendants in this Complaint.

38.     Each Defendant and co-conspirator acted as the agent or joint-venturer of, or for, the other Defendants and co-conspirators with respect to the acts, violations, and common course of conduct alleged herein.

## V.     TRADE AND COMMERCE

39.     The conspiracy formed, implemented, and enforced by Defendants and co-conspirators was intended to increase, and in fact did increase, the prices of fragrances and fragrance ingredients nationwide.

40. The conspiracy restrained competition between Defendants regarding the prices of fragrances and fragrance ingredients sold nationwide, including to Class Members located in states other than the states in which Defendants are incorporated or have their principal places of business.

41. Plaintiff and Class Members made payments to Defendants by mailing or transmitting funds across state lines.

42. Defendants manufactured fragrances and fragrance ingredients for sale in interstate and foreign commerce.

43. The activities of Defendants and co-conspirators were within the flow of interstate commerce of the United States, and were intended to, and did have, direct, substantial, and reasonably foreseeable effects on the interstate commerce of the United States.

## VI.    FACTUAL ALLEGATIONS

**A.    Factual Background**

44. Defendants are far and away the four largest producers of fragrances and fragrance ingredients in the world. Defendants collectively produce 66-70% of fragrances in the United States, which is an approximately $8.7 billion market.

45. Fragrance ingredients are chemical ingredients or chemical compounds that, alone or in combination, produce a scent. While some fragrance ingredients are natural compounds derived from sources like plants, many are synthetic chemical compounds that are created either to mimic a natural scent or create a new scent. Over 95% of these synthetic compounds are derived from petrochemicals, including benzene derivatives, aldehydes, and phthalates.

46. As part of managing the supply chain for fragrances they make for customers like Plaintiff, manufacturers such as Defendants collect and create the fragrance ingredients they need. This is a large undertaking. As Symrise explained in one investor presentation, it alone manages

10,000 raw materials for about 30,000 products. In managing and producing these raw materials, Defendants are highly reliant on synthetic chemical ingredients. As one Firmenich employee put it, modern perfumery would "[a]bsolutely not" exist today but for synthetic fragrance ingredients. The same goes for the non-perfume fragrances that make up the bulk of the fragrance market and are added to innumerable consumer goods. As Givaudan explains, fragrance ingredients—"both natural and chemical"—are the "building blocks" of all products containing fragrances, from fine fragrances to "much-loved consumer products." Synthetic chemicals that Defendants purchase or manufacture in order to make their fragrances are the backbone of the fragrance industry.

47.     As a result, Defendants sit at a critical point in the supply chain: they collect, manufacture, and process fragrance ingredients—including the synthetic ingredients that they largely manufacture alone—and thus control access to those ingredients. Those ingredients are critical to producing the fragrances that are a core component of so many consumer products. Put differently, Defendants control the ingredients that consumer products producers like Plaintiff need to make their goods.

48.     Defendants control not only those fragrance ingredients but the manufacturing of the fragrances as well. Consumer products producers generally do not purchase individual fragrance ingredients from Defendants. Instead, those producers work with manufacturers like Defendants to make fragrances (also known as fragrance compounds) from those fragrance ingredients for their products. Defendants make these fragrances by combining natural and synthetic fragrance ingredients, along with other ingredients like alcohol, coal, and tar, to emulate or create specific scents. Generally, it is these fragrances which Defendants then sell to customers—like Plaintiff—to be added to their consumer products.

49. To initiate the process of formulating a fragrance, a customer generally will submit a request to a manufacturer like Defendants to create a scent. The manufacturer will then work to create the scent, marshalling the fragrance ingredients it controls while receiving feedback from and working with the customer. When the scent is finalized, it becomes exclusive and is reserved for that customer—*i.e.*, it cannot be used as a fragrance for another customer. Manufacturers will sometimes create a new fragrance on their own and then pitch that fragrance to customers.

50. Those fragrances are critical to consumer products producers: they are the scent nearly every consumer will recognize as part of their laundry detergent, hair gel, perfume, soaps, shampoo, and deodorant, to name a few. Indeed, the vast majority of fragrances are used in products that are cosmetics or toiletries, soaps or detergents, household cleaners or air fresheners, and fine fragrances.

51. Defendants' customers are similarly vast and include a wide array of consumer products producers—from the largest cosmetics, personal products, and perfumeries in the world to candle manufacturer suppliers such as Plaintiff. Those large customers, to name a few examples, include Procter & Gamble, Unilever, LVMH, and Estee Lauder. As IFF has explained, Defendants serve a "large variety of end markets" and their products "can be found in thousands"—likely hundreds of thousands—"of consumer products around the world."

52. On occasion, Defendants also sell fragrance ingredients directly to customers who create their own fragrances. They also sometimes sell fragrance ingredients to their competitors.

53. Defendants produce fragrance ingredients and fragrances all over the world. In the United States, where a substantial amount of fragrance production occurs, the majority of manufacturing occurs in New Jersey, as described above.

54.     Each Defendant does substantial business in the United States. In fact, IFF makes approximately 30% of its sales in the United States, and each Defendant makes at least 25% of its revenue from sales in North America.

**B.      Conspiracy to Allocate Customers and Products, and to Inflate Fragrance Prices**

**1.      Antitrust Enforcement Authorities in Europe and the United States Are Investigating Defendants for Conspiring to Increase the Prices of Fragrances by Allocating Customers and Restricting Supply**

55.     At dawn on March 7, 2023, the European Commission ("EC") carried out "unannounced inspections"—raids—on the facilities of several fragrance manufacturers and a fragrance industry association. In an announcement later that day, the EC explained that it conducted the raids because of "concerns that companies and an association in the fragrance industry worldwide may have violated EU antitrust rules that prohibit cartels." The EC carried out the raids in consultation with the United States Department of Justice ("DOJ"), the United Kingdom Competition and Markets Authority ("CMA"), and the Swiss Competition Commission ("COMCO"). The EC, CMA, DOJ, and COMCO are now investigating anticompetitive conduct in the fragrance and fragrance ingredients market.

56.     On the day of the raids, the CMA announced that the Defendants named herein—Firmenich, Givaudan, IFF, and Symrise—were the subjects of its investigation. It explained that it had "reason to suspect anti-competitive behaviour has taken place involving suppliers of fragrances and fragrance ingredients for use in the manufacture of consumers products." It further noted that its investigation had proceeded in consultation with several competition authorities in different jurisdictions, including the DOJ.

57.     COMCO released a similar statement the same day, providing additional insight into the investigation. COMCO again confirmed that the Defendants named herein were the subjects of the investigation and that it had conducted "[d]awn raids" at various locations. COMCO

then explained the substantive motivations behind the investigation: It had "suspicions" that Defendants have "coordinated their pricing policy, *prohibited their competitors from supplying certain customers* and *limited the production of certain fragrances.*" (emphasis added). News reports that week similarly confirmed that the companies were "accused of coordinating their pricing policies to create bigger prices margins and preventing other fragrance companies from working with certain customers."

58.    Since the raids, Firmenich, Givaudan, IFF, and Symrise have all confirmed that they are the subjects of the investigation. And Firmenich confirmed that its offices were subject to the EC's dawn raids, explaining that "unannounced inspections were carried out at its offices in France, Switzerland and the UK."

59.    On the same day as the raids, IFF—the only Defendant parent company that is incorporated in the United States—was served with a grand jury subpoena by the Antitrust Division of the DOJ.

60.    That IFF received a subpoena authorized by a criminal grand jury indicates that the DOJ is considering bringing criminal charges against IFF and its co-conspirators. The DOJ's Antitrust Division Manual explains that "staff should consider carefully the likelihood that, if a grand jury investigation developed evidence confirming the alleged anticompetitive conduct, the Division would proceed with a criminal prosecution."[1] As a result, federal district courts have explained that, at the motion to dismiss stage, the fact of a criminal government investigation into conspiratorial conduct that violates the antitrust laws carries weight because it shows that "at least

---

[1] *In re Packaged Seafood Prods. Litig.*, No. 15-MD-2670, 2017 WL 35571, at *8 (S.D. Cal. Jan. 3, 2017) (quoting U.S. DEP'T OF JUSTICE, ANTITRUST DIV. MANUAL § F.1 (5th ed. Apr. 2015)).

several individuals within the governmental chain of command thought certain facts warranted further inquiry into a potential criminal conspiracy."[2]

> ### 2.   Defendants' Increased Ability to Reverse-Engineer Their Competitors' Fragrances Incentivized and Provided a Motive for the Conspiracy

61.     Unlike other industries, fragrance and fragrance ingredient manufacturers largely do not rely on patents to prevent other companies from using their fragrances and fragrance compounds because, generally, companies cannot patent a smell. This has led one legal commentator to explain that patents "are of limited efficacy to fragrance manufacturers, effectively protecting only newly discovered 'captive' molecules."

62.     As a result, it is entirely legal for competing fragrance and fragrance ingredient manufacturers to reverse engineer the fragrances of their competitors and sell those fragrances to customers, so long as they do not use impermissible means to acquire trade secrets. Reverse-engineering a fragrance—that is, using a chemical test to determine the ingredients and relative volume of each ingredient in a fragrance—does not violate laws protecting trade secrets.

63.     Thus, fragrance manufacturers like Defendants can use reverse-engineering tests to determine the make-up of their competitors' fragrances. In theory, this would allow them to replicate those fragrances and compete for customers that want to use those fragrances. This should have been particularly true in the last few decades because, during that time, Defendants have increased their capability to reverse-engineer fragrances as the technology to do so has become cheaper and more effective. Reverse-engineering a fragrance involves determining what fragrance ingredients and chemicals are used to make up the fragrance, and in what volume. As an employee

---

[2] *Id.*

who worked in the fragrance industry for twenty-five years explained, companies can "always break down the chemistry" of a fragrance so long as it has the right equipment to do so.

64.     Defendants increasingly use gas chromatography-mass spectrometry ("GC-MS") technologies to determine what natural and chemical ingredients are included in their so-called competitors' fragrances. GC-MS technologies allow fragrance manufacturers to determine with "remarkable accuracy" the formula of any fragrance, including those created by their so-called competitors. To do so, GC-MS technologies separate the components of a vapor and identify the separated molecules within that vapor, including their relative volumes. This process allows fragrance manufacturers to obtain any fragrance's formula "swiftly and inexpensively."

65.     Indeed, Defendants themselves recognize their ability to reverse-engineer their competitors' fragrances. For instance, in 2014, Givaudan went to trial against a former employee, alleging he had stolen trade secrets related to its fragrances by downloading them and taking them to his new job at a non-Defendant competitor. One of Givaudan's main complaints was that this process allowed its competitor to avoid going through the process of reverse-engineering its fragrances because it relied on its new employee to provide them. In other words, Givaudan *acknowledged* its competitors' abilities to reverse-engineer its fragrances. Indeed, Defendants often use GC-MS technologies on their own fragrances to make sure that they are meeting their specifications. It follows that they could do the same with their competitors' products.

66.     Large manufacturers like Defendants have greater capacity to engage in this type of reverse-engineering than smaller competitors, in part because of their size, sophistication, and resources. In other words, while Defendants largely have the ability to reverse-engineer their competitors' fragrance compounds if they so desire, smaller fragrance manufacturers do not.

67.     This ability to reverse-engineer competitors' fragrances created a problem for Defendants: Defendants are less able to rely on their proprietary fragrance compounds to maintain customers because a competitor can copy that fragrance compound and compete on price. Defendants have long held their fragrance make-ups as trade secrets, and Defendants have been able to maintain their size and stature in the fragrance industry by maintaining long-standing relationships with their customers based on their ability to be the only manufacturer that can provide a given fragrance. But Defendants' ability to reverse-engineer those fragrances threatens that status quo: large manufacturers like Defendants can now reverse-engineer their competitors' fragrances and offer those fragrances to their competitors' customers at lower prices, including prices that reflect that they did not have to undergo significant R&D expenditures (except to reverse-engineer the products).

68.     In fact, Firmenich concluded as much in a case study it published with the supply chain planning company Adexa, which stated that mass chromatography and mass spectrometry "has threatened, if not eliminated, proprietary secrets" in the fragrance and flavor industry.

69.     Indeed, in a competitive market, access to GC-MS technologies would provide *customers* with an effective tool to negotiate for price decreases. As one legal academic has explained, a client could use its ability to reverse-engineer its fragrance as a cudgel: unless its manufacturer lowered its prices, that customer could take the fragrance to another manufacturer to make the fragrance at a lower cost.

70.     This reality provided Defendants with a significant motive to conspire: Absent an agreement to allocate customers and/or products to restrain price competition, Defendants' ability to copy each other's fragrances would encourage robust price competition between Defendants to win clients for specific fragrances, thereby driving down prices for those same fragrances.

71.     Because Defendants have such high collective market share, a cartel that allocates customers and agrees not to make specific products artificially reduces price competition. It therefore ensures that Defendants can sell their fragrances and fragrance ingredients at artificially elevated prices.

**3.     Defendants Conspired to Allocate Their Customers and Inflate the Prices of Fragrances and Fragrance Ingredients**

72.     Instead of engaging in competitive behavior to address this reverse-engineering threat, Defendants entered into an agreement to allocate customers in the fragrances and fragrance ingredients market to fix, inflate, maintain, or stabilize the prices of fragrances and fragrance ingredients. In order to allocate customers, Defendants agreed to each produce only a specific subset of fragrances and fragrance ingredients and not to produce other fragrances and fragrance ingredients produced by their competitors. By doing so, Defendants ensured that when customers wanted to make a fragrance requiring a specific ingredient, only one or a limited number of Defendants would be able to do so. This greatly restrained competition in the fragrance industry and allowed Defendants to increase prices above the levels that would otherwise have been set by a competitive market.

73.     By reaching this agreement, Defendants were able to nullify the competitive effects of Defendants' ability to reverse-engineer each other's fragrances. So long as Defendants maintained a significant amount of non-overlapping fragrance ingredients, it would not matter if they could reverse-engineer each other's fragrances because they would not have the ingredients to make those fragrances. By agreeing not to produce certain fragrance ingredients, that is, Defendants restrained their ability to compete with each other by offering lower prices on specific fragrances.

74.     Defendants reached this agreement, in part, so that each could maintain higher profits. This agreement was sufficient to keep price competition at bay because smaller manufacturers are less able to reverse-engineer fragrances than large manufacturers like Defendants and generally less able to compete for Defendants' customers for reasons such as high barriers to entry, addressed below. And even if some smaller manufacturers have the capacity to reverse-engineer, because they cannot make as wide a variety of ingredients, they will nevertheless often have to ultimately buy the basic chemical ingredients from Defendants.

75.     The plausibility of Defendants' conspiracy has been confirmed by scholars who have studied the fragrance industry. As one scholar wrote in 2016, "Five multinational corporations, four of which originated in Western Europe, dominate the world fragrance market. *For years this industrial concentration fostered a tacit agreement among the industry's largest players. Under this informal understanding, the major fragrance houses would not cannibalize each other by manufacturing competing products based on formulas of a competitor acquired through reverse engineering.*" This author went on to describe this understanding as a "*gentleman's agreement*," a term also used by Calice Becker—head of the International Society of Perfumers-Creators (ISPC), whose members are predominantly affiliated with Defendants— who has described the industry as characterized by "a sort of gentleman's agreement and unspoken rules."

76.     Similarly, two other scholars have remarked on how the leading fragrance manufacturers have reached a "*non-appropriation consensus*" when it comes to "olfactory creations" (with one of these scholars making this observation in an obscure, non-publicly available French-language source by no later than 2012), and have described the fragrance "industry" as "incestuous."

77.     At some point, this tacit agreement became express. Indeed, Defendants' own employees and their co-conspirators have entered into public affirmations of this agreement not to compete. For example, the December 2022 "Perfumery Code of Ethics," authored by a former IFF employee and counting among its signatories current and former employees of Defendants and their co-conspirators, states as its first maxim the following: "We pledge to create or promote original olfactory forms. Borrowed forms shall have their original creators and formula owners named and rewarded. ***Plagiarism is not tolerated***." (emphasis added). Adherents to the Perfumery Code of Conduct have thus mutually and expressly agreed not to compete with one another over their respective fragrance formulas.

78.     Likewise, the ISPC espouses a similar sentiment on its website: "We all copy and steal like artists - it's part of the creative process to understand how masterpieces are created, but what's crucial is to know what we do with the copies. ***Have them on the market the way they are - is plagiarism.***" (emphasis added).

79.     Defendants' agreement is further evidenced by the fact that no Defendant produces anywhere close to the 3,000 fragrance ingredients that are used to make fragrances. For example, Symrise touts itself as the "No. 1 supplier of fragrance raw materials," but it lists only 207 fragrance ingredients on its website. Givaudan lists only 176 fragrance ingredients. IFF lists only 255. And Firmenich lists only 206.

80.     Even if these lists exclude certain "captive" molecules that Defendants have created, patented, and keep secret (though they appear to include them as trademarked molecules), that would not account for the dearth of fragrance ingredients each Defendant manufactures. For instance, Givaudan has explained that it has patented only "150 new molecules and processes in

the past 20 years." So each Defendant produces well fewer than the full universe of synthetic and natural fragrance ingredients that can be used to make fragrances.

81.     What is more, Defendants produce *different* fragrance ingredients among the subset of fragrance ingredients that they produce. One could imagine an innocent explanation for Defendants producing only a subset of fragrance ingredients being that certain ingredients are more difficult to produce (or used less) and, therefore, all Defendants produce a similar subset of the overall fragrance ingredients. But that is not the case. Firmenich, Givaudan, IFF, and Symrise all publish their fragrance ingredients online. Excluding the fragrance ingredients that Defendants have trademarked, each Defendant produces a substantial number of fragrance ingredients that the other Defendants do not. For instance, IFF produces lavonax, khusinil, meth cyclocitrone, and myrcenyl acetate, but neither Givaudan nor Symrise produce any of those ingredients. Similarly, Givaudan produces methyl octyne carbonate, jasmacyclene, and isopropyl quinoline, but neither IFF nor Symrise produce them (even though they both produce isobutyl quinoline, which is chemically similar but distinct from isopropyl quinoline). And Symrise produces formyrcenol, dimethyl myrcetone, and ethyl propionate, yet again neither Givaudan nor IFF produce those ingredients. These are but a few illustrative examples.

82.     Defendants' failure to produce these fragrance ingredients is not a result of capacity limitations or capital restrictions. Defendants are the largest fragrance ingredient manufacturers in the world and, as they themselves explain, use "cutting-edge chemistry and biotechnology" to develop their synthetic ingredients in order to launch "distinctive, high-performing products." Indeed, Givaudan explains that its research centers "synthesise nearly 2,000 new molecules every year," even though "[o]nly a small number of th[em] end up in [Givaudan's] perfumers' palette." Thus, it is clear that Defendants have the *capability* to produce substantially all of the synthetic

and natural fragrance ingredients that are used to make fragrances and would enable them to offer their customers the full array of fragrance options.

83.     Defendants simply choose not to produce those ingredients, even though it would be unilaterally profitable to do so. This artificially limits their ability to compete with each other for specific customers. This is evidence that Defendants have agreed to allocate those ingredients among each other and, as a result, have agreed not to compete for certain customers (or, at least, have agreed not to compete for certain fragrances that those customers request that require specific fragrance ingredients). This drives prices for fragrances containing those ingredients (and for the ingredients themselves) above competitive levels.

84.     This explanation also comports with COMCO's statement in the aftermath of the dawn raids that it had reason to believe Defendants had "prohibited their competitors from supply[ing] certain customers and limited the production of certain fragrances." COMCO's announcement is further evidence that Defendants agreed to allocate the market to increase prices above competitive levels.

**4.      Defendants' Conspiracy Resulted in Price Increases**

85.     The success of Defendants' agreement is further evidenced by the series of price increases they enacted beginning in 2018. Those price increases continued through at least 2022, and included all of the Defendants, generating increasing revenues and profit margins. Indeed, Agilex has nearly doubled the prices that it charges Plaintiff Crimson Candle Supplies in recent years.

86.     And notwithstanding that they are the subjects of an ongoing, multijurisdictional antitrust investigation, Defendants have continued to raise prices this year. For instance, Symrise announced plans to increase prices *the day after* the raids.

87.     Defendants' price increases were against their economic self-interest. Fragrance ingredients are commodity products. In other words, a specific fragrance ingredient produced by one Defendant has the same value and properties as a fragrance ingredient produced by another Defendant. As Symrise explains on its website, "Most of the fragrance ingredients we sell to our customers in our formulations are commodity products. The components are no secret. Anyone could use them and purchase the compounds on the market or even produce them themselves[.]"

88.     Therefore, absent a cartel, if any manufacturer increased the price of a fragrance ingredient (or of a fragrance that is a combination of fragrance ingredients), it would be expected that its competitors would not increase their prices but would seek to sell more fragrances to the first manufacturer's customers to steal market share from their competitor, so long as they were producing goods above marginal cost. Accordingly, it would not be in any manufacturer's unilateral self-interest to increase the price of the fragrances it sold unless it had an agreement with the other manufacturers that they would do the same or knew they could not because they had agreed not to produce competing products or to sell those products to each other's customers.

89.     In fact, Defendants have recognized as much. For example, IFF stated in its 10-K that "[i]ncreasing our prices to our customers could result in long-term sales declines or loss of market share if our customers find alternative suppliers or choose to reformulate their consumer products to rely less on our products."

90.     Defendants were confident that their price increases would not backfire, however, because their conspiracy had limited their customers' ability to shop around for a better price.

91.     Indeed, there is reason to believe that Defendants' purported justification for raising prices—that they need to cover rising input costs—is pretextual. Since 2018, Givaudan has regularly stated in its quarterly and annual financial reports that it is raising prices to cover

increased input costs, making no adjustments for when input costs are actually rising or when they are rising at different magnitudes. And contrary to Defendants' claims that their price increases have simply covered higher input costs, Defendants gross profits have often *increased* during the Class Period. For example, IFF's gross profits have increased substantially from $356 million in the final quarter of 2017 to $896 million in the final quarter of 2022. Givaudan's profits have similarly increased from $1.12 billion in the final half of 2017 to $1.3 billion in the final half of 2022—including rising to over $1.4 billion in the first halves of 2021 and 2022. In fact, Givaudan's operating *and* gross profit margins have been positive dating all the way back to 2004. Symrise has also stated that it has been "[h]ighly profitable" throughout the last decade and a half, explaining that its earnings before interest, taxes, depreciation, and amortization ("EBITDA") margin has been "between 19% and 22%" from 2006 through 2022. And Symrise's gross profits have increased from 1.224 million pounds in 2017 to 1.702 million pounds in 2022.

92.     What is more, Defendants continued announcing price increases even *after* the prices for the raw materials on which they rely stopped inflating. For instance, the Producer Price Index released by the Federal Reserve shows a significant *decrease* in petrochemicals prices in 2020 and in the latter half of 2022. To that end, in November 2022, IFF announced that there were "signs of raw material inflation easing." But Defendants did not stop raising prices during those periods nor blaming those price increases on the need to pass-on price hikes for their raw materials.

93.     As mentioned above, Defendants' consistent price increases over the past five years while profitable should have prompted at least *some of them* to undercut their competitors by offering substantially similar products at lower prices. But there is no evidence that Defendants did so. And Defendants' consistent price increases coupled with their increased profits illustrate

the opposite: that all Defendants consistently increased their prices and faced no repercussions for doing so.

      **5.**     **Plus Factors Render the Fragrance and Fragrance Ingredients Market Susceptible to Precisely the Conspiratorial Conduct Alleged Here**

         **a.**     **The Fragrance Industry Has High Barriers to Entry**

94.     As Defendants themselves acknowledge, the fragrances and fragrance ingredients market is characterized by high barriers to entry. Several components of the market make it difficult for new entrants to enter and compete, thus raising Defendants' incentive to collude because new entrants cannot enter the market and steal customers by offering lowering prices.

95.     First, because the majority of fragrance products and recipes are manufactured for individual customers, manufacturers develop close relationships with those customers that include knowledge of their specific fragrance recipes. That a new manufacturer would have to learn how to make a new customer's specific fragrances raises the cost for customers to switch manufacturers. This can make it difficult for new entrants to enter the market and obtain customers. Defendants themselves have characterized their relationships with customers as involving intensive cooperation in product development, thus making it particularly unlikely that customers would move to new entrants.

96.     Second, Defendants often enter into long-term contracts with their customers that involve even longer-term renewals that automatically recur, creating business relationships that often last decades. This too makes it less likely that customers will shift to a non-cartel competitor if their manufacturer raises fragrance prices or maintains those prices at artificial levels.

97.     Third, customers' utilization of "core lists" functions as another barrier to entry. Generally, customers develop a core list of preselected suppliers to whom they will give exclusive access to new product briefings and bidding opportunities. Therefore, it is crucial for a fragrance

supplier to be included on a client's core list to even be in the running for that client's contract, and Defendants have recognized as much. In 2003, Symrise's CEO Horst-Otto Gerberding explained that "[i]f you're not on that list, you don't get briefed, and you don't have a chance to participate[.]" Accordingly, Symrise has explicitly identified core lists as an industry barrier to entry.

98.     Moreover, both Symrise and IFF have acknowledged that multinational customers tend to limit their core lists to the same small subset of major fragrance suppliers. Consequently, smaller suppliers are often unable to compete for placement on core supplier lists, in turn severely impeding their ability to compete within the fragrance industry. IFF thus describes its own inclusion on core supplier lists as "a valuable intangible asset that helps moderate competitive threats from smaller peers."

99.     Fourth, global supply chain and regulatory restraints create additional barriers to entry. Producing fragrance products is complex, entailing the need to obtain a large number of raw materials and manage a complicated supply chain. Obtaining those materials, managing the supply chain, and producing the fragrance products themselves requires dealing with a large web of regulatory requirements that can be difficult for a new entrant to manage. Large, established players like Defendants are more capable of navigating those complex supply chains and complicated regulatory regimes than new entrants.

100.     Fifth, entering the fragrance manufacturing industry requires significant capital expenditures on marketing, manufacturing facilities, and research.

101.     Sixth, as explained above, the process for manufacturing fragrances and fragrance ingredients includes sourcing or manufacturing various raw materials (both natural and synthetic), processing those materials into fragrance compounds, and selling those fragrances to customers.

In order to insulate themselves from the need to rely on other supply chains, Defendants have vertically integrated themselves by self-sourcing ingredients for their fragrances. For instance, when Givaudan acquired Ungerer, it announced that doing so would "enhance [its] industry leadership . . . through vertical integration into key specialty ingredients for our flavour and fragrance creations." IFF has similarly explained that its "business and expertise is vertically integrated," which "allows [it] to lower costs while maintaining the security of supply and the quality, for our perfumers and our customers," and it has repeatedly stated in its financial statements that it is vertically integrated. And Symrise claims that it has undergone "[i]ndustry-leading backward integration" that involves producing both natural and synthetic fragrance ingredients and has led to it being the top supplier of fragrance raw materials. This vertical integration creates another barrier to entry by allowing Defendants to reduce costs and create economies of scale with which new entrants would be unable to compete.

102.   What is more, Defendants *depend* on these high barriers to entry to keep prices high and increase their profits. For instance, Givaudan stated in an investor presentation that these "high barriers to entry" are a "key feature" in the fragrances space because it requires mastering a specific level of complexity. And Symrise explained that "[h]igh barriers to entry" because of manufacturers' long-term relationships with clients and "increasing regulatory pressure" are part of what makes the fragrance market an "attractive niche." Market analysts confirm these high barriers to entry, explaining entry into the fragrances industry "requires significant R&D investment" as well as "specialized equipment and personnel to manufacture and develop these products."

> **b.      The Fragrance Industry is Highly Concentrated and Has Become
> More Concentrated During the Class Period**

103.    The fragrance and fragrance ingredients market is characterized by high levels of concentration, making it particularly susceptible to collusion.

104.    Defendants are the four largest producers of fragrances and fragrance ingredients and collectively hold approximately 66-70% of the global fragrance market alone. Defendants' global market shares are largely similar to their market shares in the United States.

105.    Defendants themselves have acknowledged that the fragrance industry is an "attractive niche" in part because of its "[h]igh market concentration." And academics studying the fragrance industry agree, labeling the market "highly consolidated."

106.    This consolidation has contributed to the anticompetitive behavior described herein, just as economic theory predicts. For instance, one academic explained that the "industrial concentration" has led to an "understanding" that the "major fragrance houses would not cannibalize each other by manufacturing competing products based on formulas of a competitor acquired through reverse engineering."

107.    Moreover, Defendants in recent years have used mergers and acquisitions to further solidify their market shares and concentrate the market. As explained above, DSM and Firmenich recently completed a merger that will make its new entity—DSM-Firmenich AG—the largest maker of fragrances in the world. The previous companies' combined revenues would exceed $12 billion.

108.    This is but one example of a litany of acquisitions within the fragrance and fragrance ingredients market in recent years that has led to extreme consolidation. Defendants have explained that they have entered into these acquisitions with a particular focus on gaining a stronghold in the United States. In 2014, for example, IFF acquired Aromor Flavors and

Fragrances Ltd. (a manufacturer of specialty fragrance ingredients) and Symrise acquired Diana Group (a leading manufacturer in natural products) in a large transaction valued at 1.3 billion pounds.

109.    In 2015, IFF acquired Ottens Flavors, a company with a "strong portfolio of key US-based accounts."

110.    In 2016, IFF acquired David Michael & Company, Inc. in an effort to continue to strengthen its North American business.

111.    In 2017, Firmenich acquired Defendant Agilex Flavors & Fragrances, "a leading fragrance company in North America serving mid-sized customers." In its press release announcing the acquisition, Firmenich highlighted that Agilex had a track record in designing "creative fragrances" and touted its recently launched manufacturing center in New Jersey.

112.    Acquisitions picked up even more in 2018. That year, Firmenich acquired Flavourome, Natural Flavors, Fragrance West, and Senomyx. In its announcement of its acquisition of Fragrance West, Firmenich explained that Fragrance West had a manufacturing facility in Los Angeles and focused on creative scent design.

113.    In the same year, Givaudan acquired Expressions Parfumées and Naturex. Givaudan explained that Expressions Parfumées was a "pioneer of natural fragrance compounds" and would benefit from Givaudan's "ingredients and sourcing network."

114.    IFF also acquired Frutarom in 2018.

115.    This increasing number of acquisitions continued in 2019. That year, Givaudan acquired five new companies: Golden Frog, Albert Vieille, Fragrance Oils, Drom, and AMSilk GmbH's cosmetic unit. In Givaudan's announcement of its acquisition of Fragrance Oils, it

explained that Fragrance Oils was a "leading British-based manufacturer and marketer of innovative specialty fragrances."

116.    In 2020, Symrise acquired the fragrance and aroma chemicals business of Sensient Technologies Corporation. This was another merger in the United States' fragrance and fragrances ingredients market, as Sensient is located in Milwaukee, Wisconsin. Symrise announced that the acquisition would allow it to "broaden its leadership position as a supplier of fragrance ingredients," particularly those used in "perfumes, shampoos, soaps, detergents and antiperspirants."

117.    Finally, two major acquisitions occurred in 2021. First, IFF merged with DuPont's Nutrition & Biosciences business, developing IFF into "a leader in the global consumer goods and commercial products value chain that will redefine our industry." IFF announced that the merger would give the combined companies an estimated 2020 EBITDA of $2.5 billion. Second, Givaudan acquired Defendant Custom Essence as part of a "strategy to expand the capabilities of its fragrance business." Givaudan explained that Custom Essence had a particular stronghold in the United States, which was part of its reason for acquiring the company.

118.    In sum, the fragrance industry has undergone substantial consolidation in the past nine years, with a particularly high number of acquisitions in recent years during the Class Period. During this time, Defendants have acquired a number of companies with operations focused on the United States, making the fragrance market in the United States exceptionally concentrated.

119.    This trend is likely to continue. As Credit Suisse recently noted in a market analysis of Symrise, "supply chain dynamics" in the fragrances market should continue to "favour large Flavour & Fragrances (F&F) companies at the expense of smaller F&F," causing "[f]urther consolidation" and "driv[ing] smaller F&F players out of the market."

### c.      Fragrance Products Are Fungible.

120.    Both Defendants and their customers view fragrances and fragrance ingredients as fungible—or substitutable—increasing the likelihood that Defendants could collude to increase the price of those products.

121.    For instance, in its decision approving Defendant Givaudan's acquisition of another fragrance manufacturer, the EC explained that there is supply-side substitutability supporting the argument that a single market for fragrances exists.

122.    To that end, although Defendants have suspiciously chosen not to produce many overlapping fragrances and fragrance ingredients, they each have the capability to produce fragrances for all necessary applications. And because fragrance ingredients are uniform chemical compounds, there is no meaningful difference between a fragrance ingredient (or combination of fragrance ingredients in the form of a fragrance) produced by one Defendant as compared to another.

123.    This would have incentivized Defendants to collude. If fragrance ingredients were differentiated based on who manufactured them, there would be natural price differences between the ingredients produced by different manufacturers based on their quality, differences, and more. But because, for instance, benzyl propionate (a fragrance ingredient) is the same if it is produced by Symrise or Givaudan, Symrise cannot naturally increase the price of *its* benzyl propionate compared to Givaudan's (benzyl propionate is one of the few ingredients both Symrise and Givaudan use, though IFF does not). As a result, fragrance manufacturers are more inclined to collude and collectively raise the prices of these undifferentiated products. And in fact, this lack of differentiation illustrates Defendants' desire for the particular form of collusion here. Rather than simply agree to fix the prices of a wide range of fragrance ingredients, Defendants recognized they could eliminate the need to compete on the price of those interchangeable ingredients if they

instead divvied them up. It no longer matters that a fragrance ingredient produced by different manufacturers are interchangeable if only one Defendant makes that ingredient.

### d.    Demand for Fragrances and Fragrance Ingredients is Inelastic

124.    Industries that are characterized by inelastic demand are particularly susceptible to collusion because customers will buy products even in the face of sustained price increases. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase the product despite the price increase. If producers in industries characterized by inelastic demand can increase prices without being undercut by their competitors, they can recognize increased profits.

125.    The fragrance industry is characterized by inelastic demand. Because there are no substitute goods for fragrances and fragrance ingredients, customers cannot turn to alternative products in the face of price increases. That is, there are not non-fragrance goods that can be used to substitute for fragrance goods in consumer products. So, consumer products producers cannot turn to non-fragrance goods for their products in the face of a price increase across all fragrances and fragrance ingredients.

126.    Similarly, fragrances and fragrance ingredients are often used as a *component* of another product—not as a standalone product. In other words, customers of fragrances and fragrance ingredients largely incorporate those products into other products—like soaps, shampoos, and deodorants. As a result, the cost of the fragrances or fragrance ingredients is often a small portion of the cost of the product. Because it is such a small component of the overall cost, customers are unlikely to change their buying habits based on a small but significant increase in those component prices.

127.    Defendants have acknowledged as much. For instance, Symrise explained in an investor presentation during the Class Period that Defendants are in a "[s]weet spot" in the value

chain because they control "a key buying criteria" but that component makes up "only a small fraction of product costs."

### e. Defendants Had Numerous Opportunities to Collude Through Trade Associations and Industry Events

128.    Industries in which competitors frequently communicate are susceptible to collusion. This is particularly true when competitors participate in trade associations together, because trade association meetings can provide a forum to discuss sensitive information and organize a cartel. Defendants—supposed competitors in the fragrance market—frequently communicate and participate in trade associations that play a particularly important role in the industry.

129.    Defendants are members of several trade associations, which courts have recognized can provide a forum for and help facilitate collusive behavior. Defendants' involvement in trade associations is of particular importance here because the EC has indicated that there is reason to believe that a trade association facilitated Defendants' conspiratorial behavior. Following its dawn raids, the EC announced its concerns that Defendants "and an association in the fragrance industry" may have violated antitrust laws.

130.    For example, Defendants were able to coordinate and affect this conspiracy in part through their control of, and constant communications through, the International Fragrance Association ("IFRA"). IFRA is an international trade association representing the "global fragrance industry" with the express "mission to represent the collective interests of the industry and promote the safe use and enjoyment of fragrances around the world." IFRA "brings together seven multinational companies": the four Defendants, Robertet Groupe, Takasago International Corporation, and BASF.

131.    Defendants wield significant power over and through IFRA. Symrise's Chief Sustainability Officer has been the Chair of IFRA since April 2020. For the five years beforehand, Givaudan's Fragrance Division President was the board's Chair. To this day, every Defendant maintains a representative on IFRA's board, and Givaudan's representative is Vice Chair.

132.    IFRA has served as a mechanism to coordinate and facilitate Defendants' conspiracy. In addition to its multi-day Global Fragrance Summit at which Defendants meet and intermingle, IFRA frequently holds other events attended by some or all Defendants that provide an opportunity to converse in private. For instance, each and every Defendant had a representative that attended the most recent IFRA Global Fragrance Summit in person.

133.    Defendants also participate in several other trade associations that could provide forums for their collusive communications. Most importantly, Defendants launched *their own* North American trade association, Fragrance Science & Advisory Council ("FSAC"), after *jointly* deciding to leave the then-extant North American trade association, Fragrance-Creators Association ("FCA"). In 2020, Defendants announced that they were leaving the FCA at approximately the same time. Defendants then launched FSAC, in which they were the *only* members. Reporting at the time explained that FSAC "unites the world's leading fragrance and flavor companies in an effort to drive science-based public policy in North America." FSAC set out with the express goal to focus on "business-to-business audiences" in order to "defend[] fragrance ingredients" against, among other things, criticism from "consumer[s]." To date, FSAC has added only one non-Defendant member—Bath and Body Works.

134.    However, since the investigation into Defendants began, IFF has *left* FSAC and *rejoined* FCA. In the announcement that IFF rejoined FCA, FCA makes no mention of the fact that IFF once left the trade association and provides no reason for its rejoining. It is reasonable to

infer that IFF recognized that FSAC presented a unique opportunity to collude with its main competitors with very few other participants and left in an attempt to shield itself from antitrust liability once it realized it was under scrutiny from antitrust authorities.

135.    Defendants also are all active members of the Research Institute for Fragrance Materials ("RIFM"). RIFM explains that it is the "leading resource in the world for the safe use of fragrance ingredients." Defendants all serve on RIFM's Advisory Committee and are the most prominent members of RIFM's "Core Teams," which "advise and consult on strategic issues related to RIFM's goals." Thus, Defendants attend meetings of RIFM's Advisory Committee and Core Teams together, and they exert significant influence over RIFM's activities.

136.    Defendants also had significant opportunities to collude at other industry events, including those thrown by the American Society of Perfumers. For instance, at the American Society of Perfumers' golf event, pictures show executives from Firmenich, Givaudan, and IFF paired in groups together. And pictures from the American Society of Perfumers' Symposium similarly show Firmenich and IFF executives posing with their arms around each other. These examples illustrate the coziness of executives from different fragrance companies as well as the many opportunities those executives had to collude and share competitively sensitive information with one another.

### f.    Inter-Defendant Sales Provided a Method to Monitor and Enforce the Conspiracy

137.    While Defendants largely each produce the fragrance ingredients that they use in their respective fragrances, Defendants also purchase fragrance ingredients from each other as necessary to fill customer orders. They also license and sell their "captive" proprietary molecules to each other. As a result, their sales and production staff are in frequent communication, providing

a mechanism to organize and maintain a cartel. These inter-defendant sales provide a mechanism to both monitor and enforce the conspiracy.

138.    Indeed, that Defendants rely on each other for materials increases their incentives to collude and provides a mechanism for punishing cartel participants who attempt to cheat on the cartel. That is, Defendants can threaten to withhold the materials that they sell to each other if a specific cartel participant cheats on the agreement. For example, if a Defendant uses a particular ingredient that is required to make a fragrance for a particular customer, they can agree to sell that ingredient to another Defendant only if the other Defendant agrees not to attempt to poach the first Defendant's customer.

**C.    Anticompetitive Effects and Injury Suffered by Class Members**

139.    As a result of Defendants' anticompetitive conduct alleged herein, competition between Defendants was restrained or eliminated in the market for fragrances and fragrance ingredients in the United States during the Class Period.

140.    As a result of Defendants' anticompetitive conduct alleged herein, the prices Class Members paid for fragrances and fragrance ingredients was fixed, stabilized, or maintained at artificially increased levels during the Class Period.

141.    The purpose of Defendants' conspiratorial conduct was to increase, fix, or maintain the prices of fragrances and fragrance ingredients in the United States, and, as a direct and foreseeable result of the conspiratorial conduct, Plaintiff and the Class purchased fragrances and fragrance ingredients at artificially inflated prices during the Class Period.

142.    By reason of the alleged violations of the antitrust laws, Plaintiff and the Class have sustained injury to their businesses or property, having purchased fragrances and fragrance ingredients for higher prices during the Class Period than they would have paid in the absence of

Defendants' illegal contract, combination, or conspiracy. As a result, Plaintiff and the Class have suffered damages.

143.    This is an injury of the type that the antitrust laws were meant to punish and prevent.

144.    The effects and injuries caused by Defendants' anticompetitive agreement commonly impacted all direct purchasers of fragrances and fragrance ingredients in the United States.

### VII.    STATUTES OF LIMITATIONS DO NOT BAR PLAINTIFFS' CLAIMS

#### A.    Continuing Violation

145.    During the Class Period, Defendants' conspiracy was a continuing violation in which Defendants repeatedly invaded Plaintiff and Class Members' interests by adhering to, enforcing, and reaffirming the anticompetitive agreement described herein.

146.    Defendants' continuing adherence to, enforcement of, and reaffirmation of the anticompetitive agreement throughout the Class Period was and is consummated through, among other conspiratorial acts, repeatedly selling Plaintiff and the Class fragrances and fragrance ingredients at artificially inflated prices, communicating with each other to discuss the terms of and continued adherence to the conspiracy, continually refusing to compete for each other's customers, and negotiating with Plaintiff and members of the Class to ensure sales at artificially inflated rates.

#### B.    Fraudulent Concealment

147.    Plaintiff and other Class Members had neither actual nor constructive knowledge of the facts constituting their claim for relief until at least March 7, 2023, when the EC announced its investigation into Defendants. Plaintiff and other Class Members similarly were not on notice that the DOJ had opened a criminal grand jury investigation into IFF until IFF publicly announced in May 2023 that it had been served with a grand jury subpoena. Moreover, the scholarly

commentary cited herein describing Defendants' anticompetitive conduct was published in obscure academic books and articles, including in foreign languages, and describes only a "tacit," not explicit, agreement among the Defendants. And the public commitments by Defendants not to "plagiarize" one another's work cited herein were made only in 2022. Furthermore, many sources of industry news and information, including many cited in this Complaint, are behind paywalls and thus generally inaccessible to the broader public. Thus, Plaintiff and other Class Members did not and could not have known about Defendants' anticompetitive agreement until shortly before filing this Complaint, or at the very earliest in 2022. Defendants engaged in a secret conspiracy that did not reveal facts that would put Plaintiff or the Class on inquiry notice that there was a conspiracy to allocate products and customers and inflate the prices of fragrances and fragrance ingredients in the United States.

148.    Defendants' anticompetitive conspiracy, by its very nature, was self-concealing. Fragrance manufacturers are not exempt from antitrust regulation, and thus, Plaintiff and the Class reasonably considered the fragrance industry to be competitive until recently. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of prices paid by Class Members to Defendants for fragrances and fragrance ingredients in the United States.

149.    Plaintiff exercised reasonable diligence. Plaintiff and the other Class Members could not have discovered the alleged conspiracy at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by Defendants and co-conspirators to conceal their combination.

150.     Throughout the Class Period, Defendants effectively, affirmatively, and fraudulently concealed their unlawful combination and conspiracy from Plaintiff and the other Class Members.

151.     The combination and conspiracy alleged herein was fraudulently concealed by Defendants by various means and methods, including, but not limited to, Defendants' repeated public statements that they offered competitive prices—*e.g.*, that they offer prices set by competitive forces in the market rather than by the anticompetitive agreement alleged herein. During the Class Period, Defendants affirmatively and falsely represented that they set competitive prices for fragrances and fragrance ingredients. As just one example, Givaudan repeatedly stated in its 2022 Annual Report that it had to avoid certain operational risks that would prevent it from delivering products at "competitive prices"—implying that it otherwise *does* set its prices for fragrances and fragrance ingredients competitively. Similarly, Givaudan stated in that same report that the fragrance industry is a "competitive and dynamic environment." And IFF has stated that it aims to create "not only innovative, but also cost-effective [fragrance] ingredients."

152.     These false representations were used to conceal the conspiracy.

153.     By virtue of Defendants' fraudulent concealment of their wrongful conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiff and the other Class Members have as a result of the unlawful combination and conspiracy alleged in this Complaint.

## VIII.   CLASS ACTION ALLEGATIONS

154.     Plaintiff Crimson Candle Supplies brings this action on behalf of itself, and on behalf of the members of the following Class, under the Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3):

All persons or entities that purchased fragrances or fragrance ingredients directly from any of the Defendants or their subsidiaries or affiliates in the United States, its territories, and the District of Columbia, including those who purchased fragrances or fragrance ingredients outside the United States but were billed or invoiced for fragrances or fragrance ingredients that were imported into the United States, from January 1, 2012 until the effect of the conspiracy ceased.

155.     The following persons and entities are excluded from the proposed Class: Defendants, co-conspirators, and any of their subsidiaries, predecessors, officers, or directors; federal, state, or local governmental entities; and the court and any of its staff.

156.     The Class definition provides clear, objective criteria understood by Class Members and Defendants, and it allows the parties to identify the members of the Class.

157.     Subject to additional information obtained through further investigation and discovery, the Class definition may be expanded or narrowed.

158.     The Class is so numerous that joinder of all members of the Class in this action is impracticable. Plaintiff are informed and believe, and on that basis allege, that the proposed Class contains thousands of similarly situated customers.

159.     The Class is readily identifiable and is one for which records should exist.

160.     Plaintiff's claims are typical of those of the Class. Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the Class, and the relief sought is common to the Class.

161.     Plaintiff and Class Members were injured by the same unlawful conduct, which resulted in them receiving less in value for fragrances and fragrance ingredients (by overpaying for those products) than they would have in a competitive market.

162.     Plaintiff will fairly and adequately protect and represent the interests of the Class. The interests of the Plaintiff are aligned with, and not antagonistic to, the Class.

163.    Questions of law and fact common to Class Members predominate over questions, if any, that may affect only individual members because Defendants have acted and refused to act on grounds generally applicable to Class Members.

164.    Questions of law and fact common to the Class include:

- Whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices Class Members paid for fragrances and fragrance ingredients;

- Whether Defendants engaged in an agreement, combination, or conspiracy to allocate their customers for fragrances and fragrance ingredients and engaged in an agreement, combination, or conspiracy to allocate those products;

- Whether such agreements constituted violations of the Sherman Antitrust Act;

- The identity of the participants of the alleged conspiracy;

- The duration of the conspiracy alleged herein and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

- Whether Defendants fraudulently concealed their misconduct;

- Whether and to what extent Defendants' anticompetitive scheme inflated prices of fragrances and fragrance ingredients above competitive levels;

- The nature and scope of injunctive relief necessary to restore competition; and

- The measure of damages suffered by Plaintiff and the Class.

165.    Plaintiff is represented by counsel who are experienced and competent in the prosecution of complex class action antitrust litigation.

166.    Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly

situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Class compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Class to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Class is impractical, and the prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

167.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

## IX.    CAUSE OF ACTION

### FIRST CLAIM FOR RELIEF

**CONSPIRACY TO ALLOCATE CUSTOMERS AND PRODUCTS AND FIX PRICES IN VIOLATION OF SECTIONS 1 AND 3 OF SHERMAN ANTITRUST ACT**

168.    Plaintiff incorporates and realleges, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

169.    Beginning from at least January 1, 2012 and continuing through the present, Defendants, as well as their co-conspirators, entered into a continuing agreement, understanding, and conspiracy in restraint of trade to allocate customers and products and fix prices within the fragrance and fragrance ingredients market with the goal and intent of inflating the prices of

fragrances and fragrance ingredients in the United States in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3.

170.    In formulating and carrying out the alleged agreement, understanding, and conspiracy, Defendants, as well as their co-conspirators, did those things that they combined and conspired to do, including but not limited to:

      a.   Reached agreements—through in-person meetings, exchanges of information, and other communications—to fix, inflate, maintain, and stabilize the prices of fragrances and fragrance ingredients in the United States;

      b.   Reached agreements—through in-person meetings, exchanges of information, and other communications—to allocate customers and products within the fragrance and fragrance ingredients market with the goal and intent of inflating the prices of fragrances and fragrance ingredients in the United States;

      c.   Implemented, monitored, and enforced that conspiracy to inflate prices through in-person meetings, exchanges of information, inter-defendant sales, and other communications; and

      d.   Sold fragrances and fragrance ingredients to Plaintiff and Class Members at the fixed, inflated, maintained, and stabilized prices in the continental United States.

171.    This conspiracy is a *per se* violation of Section 1 of the Sherman Act.

172.    The combination and conspiracy alleged herein has had the following effects, among others:

      a.   Competition for customers in the fragrance and fragrance ingredients industry has been restrained, suppressed, and/or eliminated in the United States;

b.   Competition on price in the fragrance and fragrance ingredients industry has been restrained, suppressed, and/or eliminated in the United States; and

c.   Prices paid for fragrances and fragrance ingredients has been fixed, inflated, maintained and stabilized at artificially high, noncompetitive levels throughout the United States.

173.   Plaintiffs and the other Class Members have been injured in their businesses and property by paying more to Defendants, their subsidiaries, and/or related entities than they would have in the absence of the combination and conspiracy.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray that:

The Court declare, adjudge, and decree this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the Class defined herein, appoint Plaintiff as Class Representative and its counsel of record as Class Counsel, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to the Class once certified;

A.   Defendants' actions alleged herein be adjudged and decreed to be in violation of Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1, 3;

B.   Plaintiff and the other Class Members recover their damages from each Defendant, jointly and severally, in an amount to be determined, and that this damages amount be trebled pursuant to 15 U.S.C. § 15(a);

C.   Plaintiff and the other Class Members be awarded pre- and post-judgment interest as allowed by law and that such interest be awarded at the highest legal rate from and after the date of service of this Complaint;

D.      Defendants, their affiliates, successors, transferees, assignees and other officers, directors, partners, agents and employees thereof, and all other entities or persons acting or claiming to act on their behalf or in concert with them, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect;

E.      Plaintiff and the other Class Members recover their costs of this suit, including reasonable attorneys' fees, as provided by law; and

F.      Plaintiff and the other Class Members be granted such other relief as the case may require and deemed proper to this Court.

## XI.    JURY TRIAL DEMAND

Plaintiff demands a trial by jury of all issues so triable in this case.


Dated: July 20, 2023                        Respectfully submitted,

                                            /s/ *Eric T. Kanefsky*
                                            Eric T. Kanefsky (N.J. Bar No. 024292002)
                                            Ralph J. Marra, Jr. (N.J. Bar No. 020761978)
                                            Thomas R. Calcagni (N.J. Bar No. 044801997)
                                            Martin B. Gandelman (N.J. Bar No. 015592011)
                                            CALCAGNI & KANEFSKY LLP
                                            1085 Raymond Boulevard, 14th Floor
                                            Newark, New Jersey 07102
                                            Telephone: (862) 397-1796
                                            Fax: (862) 902-5458
                                            eric@ck-litigation.com
                                            rmarra@ck-litigation.com
                                            tcalcagni@ck-litigation.com
                                            mgandelman@ck-litigation.com

*Counsel for Plaintiff and the Proposed Class*

Michael Eisenkraft
Laura Posner (*pro hac vice* forthcoming)
Christopher Bateman (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-0177
Fax: (212) 838-7745
meisenkraft@cohenmilstein.com
lposner@cohenmilstein.com
cbateman@cohenmilstein.com

Zachary Krowitz (*pro hac vice* forthcoming)
Nina Jaffe-Geffner (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave NW, Fifth Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
zkrowitz@cohenmilstein.com
njaffegeffner@cohenmilstein.com

Daniel H. Silverman (*pro hac vice* forthcoming)
COHEN MILSTEIN SELLERS & TOLL PLLC
769 Centre Street, Suite 207
Boston, MA 02130
Tel: (617) 858-1990
Fax: (202) 408-4699
dsilverman@cohenmilstein.com
*Counsel for Plaintiff and the Proposed Class*

Daniel L. Brockett (*pro hac vice* forthcoming)
Manisha M. Sheth (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010-1601
Telephone: (212) 849-7000
Fax: (212) 849-7100
danbrockett@quinnemanuel.com
manishasheth@quinnemanuel.com

Jeremy D. Andersen (*pro hac vice* forthcoming)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP

865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Fax: (213) 443-3100
jeremyandersen@quinnemanuel.com
*Counsel for Plaintiff and the Proposed Class*

Curt Lockhart (*pro hac vice* forthcoming)
LOCKHART IP
68 S 200 W A
Bountiful, Utah 84010
Telephone: (713) 487-6624
curt@usipconsulting.com
*Counsel for Plaintiff and the Proposed Class*

## LOCAL RULE 11.2 CERTIFICATION

The undersigned hereby certifies, pursuant to 28 U.S.C. § 1746, that the within action is not the subject matter of any other actions in this Court or any other Court except as follows:

1. *Our Own Candle Co., Inc. v. Givaudan S.A.*, Case No. 23-cv-02174 in the United States District Court for the District of New Jersey;

2. *Candle Shoppe of the Poconos, Inc. v. Givaudan S.A.*, Case No. 23-cv-03049 in the United States District Court for the District of New Jersey;

3. *B&E Assoc., Inc. v. Firmenich S.A.*, Case No. 23-cv-03050 in the United States District Court for the District of New Jersey;

4. *Chautauqua Soap Co. v. Givaudan S.A.*, Case No. 23-cv-03249 in the United States District Court for the District of New Jersey;

5. *Demeter F.L., Inc. v. Internationat'l Flavors & Fragrances Inc.*, Case No. 23-cv-03265 in the United States District Court for the District of New Jersey;

6. *Hanna's Candle Co. v. Internationat'l Flavors & Fragrances Inc.*, Case No. 23-cv-03266 in the United States District Court for the District of New Jersey; and

7. *Cospro Development Corp. v. Internationat'l Flavors & Fragrances Inc.*, Case No. 23-cv-03368 in the United States District Court for the District of New Jersey.

I further certify that no other action is contemplated and that the matter in controversy is not the subject of any arbitration proceedings.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Date: July 20, 2023

/s/ *Eric T. Kanefsky*
Eric T. Kanefsky, Esq.